IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

```
SHALONCA HENDRIX            :
o/b/o S.F.H.                :
                            :        CIVIL ACTION
        Appellant,          :
                            :        NO. 1:12-CV-2086-WSD-ECS
v.                          :
                            :
CAROLYN W. COLVIN,          :
Acting Comm'r of Soc. Security :
                            :
        Respondent.         :
```

**FINAL REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff-appellant ("Appellant") S.F.H., through her mother, Shalonca Hendrix, brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Supplemental Security Income. This case is before the Court on the administrative record and the parties' pleadings and briefs. For the reasons expressed herein, **IT IS RECOMMENDED** that the Commissioner's decision be **REVERSED and REMANDED** for further proceedings consistent with this Final Report and Recommendation.

**I.**
**Procedural History**

On April 2, 2008, Shalonca Hendrix protectively filed an application for Supplemental Security Income disability benefits on behalf of Appellant, her minor child. (T. 74). The application was

denied initially and on reconsideration. (T. 75-78, 81-84).   On
February 25, 2011, a disability hearing was held before an
Administrative Law Judge ("ALJ"). (T. 39-65).  After the hearing, on
March 18, 2011, the ALJ issued a decision finding Appellant not
disabled. (T. 16-33). The Appeals Council denied Appellant's request
for review of the ALJ's decision on April 25, 2012. (T. 1-5). On
June 19, 2012, Appellant timely filed a complaint in this Court
seeking a review of the Commissioner's decision. [Doc. 5].

## II.
### Factual Background

Appellant was born on September 10, 1998, and was nine (9)
years old at the time of her application for SSI benefits. (T. 234).
Appellant's mother, Ms. Hendrix, alleged that Appellant was disabled
due to "arthritis in knees, ankles, left wrist and right hip" and
that Appellant's "short term memory is gone and she will use the
wrong words or forget to say what word would go next in a
statement." (T.  238).  Appellant was twelve (12) years old and in
the sixth grade at the time of the disability hearing before the
ALJ. (T.  19,  43).  Ms.  Hendrix  testified  at  the  hearing  that
Appellant  had  arthritis,  short-term  memory  lapses,  attention
deficit,  speech  problems,  and  side-effects  from  medications.  (T.
45-50, 53-54).

2

A.   **Medical History**

   1.   **Arthritis**

Appellant was diagnosed with juvenile idiopathic[1] arthritis on April 30, 2007, after testing positive for anti-nuclear antibodies ("ANA"). (T. 395, 432-34, 510, 810). Appellant's abnormal motor skills became apparent in 2001, however, when doctors noticed that she externally rotated while walking and occasionally dragged her feet. (T. 809, 1285). At that time, Appellant was diagnosed with a gross motor disorder and had "protruding abdomen, increased lumbar lordosis, hyper-extension at her knees, foot pronation, and external rotation at her hips." (T. 1285).   After several years of rehabilitative therapy, Appellant was discharged from physical therapy on April 4, 2005. See (T. 1209-1285).   When Appellant was later diagnosed with arthritis in 2007, she was prescribed Naproxyn and additional physical therapy. (T. 809).   Her arthritic symptoms eventually spread to other joint areas and included swelling in the fingers.  (T. 809).

On August 27, 2007, Appellant visited Dr. Donna Gibbas, M.D., at the Atlanta Regional Pediatric Rheumatology Center. (T. 432-34). Dr. Gibbas noted that Appellant "still complains [of] joints hurting

---

   [1] The term "idiopathic" means "arising spontaneously or from an obscure or unknown cause." See Merriam Webster Dictionary, http://merriam-webster.com/medical/idiopathic (last visited August 8, 2013).

AO 72A
(Rev.8/82)

- better. No AM stiffness or weather sensitivity." (T. 432-34).
Appellant had tightness in her left wrist and mild tightness in her
ankle. She was taking Naproxen 250 mg. (T. 432-34). Appellant saw
Dr. Gibbas approximately twice per year, most recently in January
2009. (T. 809).

On June 3, 2010, after Dr. Gibbas retired, Appellant visited
Dr. Rita Jerath, M.D., at the Pediatric Rheumatology Clinic at the
Medical College of Georgia. (T. 809-11). Appellant reported to Dr.
Jerath that the prescribed Naproxyn provided some relief for her
symptoms, but not a significant amount. (T. 809). Dr. Jerath noted
that "[i]t is apparent that she is not taking the medication on a
regular basis." (T. 809). Appellant's chief complaint at that time
was pain in her feet. Appellant's mother, Ms. Hendrix, told Dr.
Jerath that Appellant had some previous swelling in the knees and
wrists. Dr. Jerath noted that Appellant "appears to be tight. The
patient does not complain of being stiff. She denies any pain in the
neck, jaw area or lower back." (T. 809). She described Appellant as
obese and somewhat slow in her responses. (T. 810).

Dr. Jerath's musculoskeletal examination revealed that
Appellant had normal range of motion at the joint areas and no
definite swelling. (T. 810). She noted that Appellant "is tender to
palpation at her knees and over mid foot and ankles. There is a
question of fullness to the left ankle." (T. 810). Appellant's

4

hands showed "excellent" range of motion with a strong grip. There was no swelling or deformities at the small joints of Appellant's hands. X-rays revealed no evidence of fractures or dislocations in the ankles or feet. (T. 811). "The bones are well mineralized for patient's stated age. The articular surfaces, joint spaces, and growth plates are unremarkable. There is no significant soft tissue swelling." (T. 811). Dr. Jerath assessed Appellant as having polyarthralgia and advised that she continue taking the Naproxen on a more regular basis. (T. 810).

At a follow up visit with Dr. Jerath on October 12, 2010, Appellant denied having any pain in her feet and hands. (T. 984). Dr. Jerath's musculoskeletal exam revealed nothing abnormal. (T. 984). She noted that Appellant was playing soccer. (T. 984).[2]

**2.   Speech and Language Processing Disorder**

On January 19, 2001, Appellant underwent an evaluation at the Savannah Speech and Hearing Center and was diagnosed with "a moderate delay in the development of language." (T. 860). On June 5, 2007, Appellant was evaluated at Backus Children's Hospital for speech therapy. (T. 454). Test results revealed that Appellant had "moderate delay[s] in receptive and expressive language skills." (T. 454). Appellant scored in the twelfth percentile (12%) for her age

---

[2] It is unclear whether Dr. Jerath's records from this date state "6th yr" or "6th gr" next to the word "soccer."

group in the category of language concepts and directions. Her word structure, ability to recall and formulate sentences, and core language skills were all in the less than one percentile (1%) range. Similarly, Appellant's ability to articulate sounds in words was in the three (3%) percentile range. (T. 454). It was recommended that Appellant participate in speech therapy once per week. (T. 454).

By January 2008, after approximately six months of speech therapy, Appellant was making "significant progress" in her speech goals of 80% accuracy in target phonemes and defining words with two traits with minimal assistance. (T. 440-41, 609-10). Therapy was continued throughout 2008, and Appellant's speech goals were updated as they were met. (T. 592-609). Appellant met goals in April and June 2008, (T. 599, 603), and made gains "in the areas of concepts and following directions (+ 9 months age equivalency), and in both receptive (+4 months) and expressive (+6 months) word classes in the last 6 months." (T. 596). By November 2008, Appellant met three additional speech goals. (T. 589-594). Despite her progress, Appellant's speech therapist noted on November 6, 2008, that Appellant "tends to forget answers she just provided – needs cues to not repeat self." (T. 587). Appellant was reportedly receiving extra help at school with reading. (T. 587).

On October 5, 2010, Sarah Schiesser, OTRL, completed a "Speech/Language Questionaire" on Appellant. (T. 1314-1315). Ms.

Schiesser opined that Appellant's speech and language problems interfered with her academic progress and had resulted in decreased self-confidence. Ms. Schiesser stated that Appellant had decreased auditory processing and written expression skills, as well as difficulties in retaining knowledge. (T. 1314). She noted that Appellant is hesitant to communicate certain wants and needs if she isn't questioned or further probed for information. Ms. Schiesser stated that Appellant's greatest difficulties were with higher level concepts and language skills. "She has difficulty with specific details of stories and writing of sentences." (T. 1315).

On October 19, 2010, Julie R. Hunt, MS, CCC-SLP, completed a "Speech/Language Questionaire" on Appellant. (T. 1316-1317). Ms. Hunt wrote that Appellant's language processing disorder makes it difficult for Appellant to follow verbal instructions, oral stories, and discussions. (T. 1316). She stated that Appellant withdraws from social situations "secondary to not understanding the conversation or because she doesn't understand what is being asked." (T. 1316). Ms. Hunt further stated that Appellant frequently says "I can't" because she needs extra modifications. Ms. Hunt opined that Appellant is aware of what she wants to say but can't express it because of her processing disorder. (T. 1316). "Special support is needed to help her understand what is being required ...." (T. 1317).

7

### 3.   ADHD and Related Issues

On November 5, 2004, when Appellant was six years old, she was referred for Attention Deficit Hyperactivity Disorder ("ADHD") testing due to "trouble remembering what is taught in class." (T. 369). On November 15, 2004, Dr. Thomas K. Pedigo, Ed.D., performed a battery of tests and found that Appellant's intelligence level was in the "Low Average" range of ability. (T. 933-937).  Based on the test results, Dr. Pedigo opined that Appellant would likely experience "considerable frustration in the typical school setting" due to her problems with hyperactivity, attention, and concentration.  (T. 937).  He stated that, "[a]cross the board she meets the diagnostic criteria for ADHD Inattentive Type" and would likely benefit from medical intervention.  (T. 937).

Approximately four years later, on July 9, 2008, Dr. Pedigo performed a second evaluation on Appellant. (T. 311-321). At that time, Appellant's teachers and mother were concerned about Appellant's ongoing academic problems. (T. 312).  Appellant was nine (9) years and ten (10) months old on the testing date. (T. 320). Dr. Pedigo noted in his examination report that Appellant read below her grade level and had difficulty retaining information. (T. 312). He further noted that, despite Appellant's previous diagnosis of ADHD, Appellant "was unable to continue three different medication

8

regimens that were tried as a result of negative side effects." (T. 312).

During testing, Dr. Pedigo observed that Appellant had normal speech in terms of rate and volume but "exhibited poor verbal expression." (T. 314).   Although Appellant's comprehension for directions was average, she had increased difficulty with multi-step instructions. Her responses were of below average quality. (T. 314). Dr. Pedigo noted that Appellant appeared to have "significant difficulty with phonetic decoding" and "laboriously sounded out words." (T. 314).   She remained attentive during testing, however, and was engaged in task demands.   Overall, Dr. Pedigo found that Appellant put forth an average effort during testing and was not significantly distracted. (T. 314).

Dr. Pedigo's July 2008 testing revealed that Appellant had a Verbal Intelligence score of 83, a Nonverbal Intelligence score of 88, and a Composite Intelligence score of 83, all of which were considered to be within the "Low Average" range of ability. (T. 315).   Her score on the Composite Memory Index was a 79, which was in the "Borderline" range of ability. (T. 315). Appellant's "Reading Composite" scores were in the 8th percentile range, and her "Pseudoword Decoding" score was consistent with a child in Kindergarten. (T. 319). Appellant's "Mathematics Composite" scores were in the 21st percentile range.   (T. 319).

On the Wide Range Assessment of Memory and Learning-II test ("WRAML-2"), Appellant scored a 67 in the area of attention and concentration, which was in the "Significantly Below Average" range. (T. 316). On two of the three tasks in the Pediatric Attention Disorders Diagnostic Screener ("PADDS"), Appellant received scores consistent with children who have ADHD. (T. 317-318). On the Clinical Assessment of Behavior ("CAB") test, which was completed by Ms. Hendrix, Dr. Pedigo wrote that the scores largely reflected Ms. Hendrix's view that Appellant experienced "minimal behavioral, educational or adaptive difficulties within the home environment." (T. 945). Likewise, the results of the Behavior Rating Inventory of Executive Function ("BRIEF") test, which was also completed by Ms. Hendrix, reflected Ms. Hendrix's view that Appellant was "exhibiting minimal executive functioning difficulties at this time." (T. 946).

According to Dr. Pedigo, "[t]aken together, [the] test results and clinical observations indicate that [Appellant] is likely to experience frustration in the typical school setting at this time due to problems with sustained attention and concentration." (T. 320). He opined that Appellant's performance would likely improve with appropriate intervention. (T. 320). Dr. Pedigo specifically recommended that (1) Appellant try low dose medications for ADHD, (2) the school receive the test results to address Appellant's ADHD and her deficiencies in reading, (3) Appellant continue in speech

10

therapy, and (4) Appellant attend group social skills training in conjunction with parent consultation and psycho-education on child behavior management. (T. 321).

On August 24, 2010, Dr. Pedigo performed a third evaluation on Appellant for ADHD. (T. 804-808). On the testing date, Ms. Hendrix reported to Dr. Pedigo that Appellant "fails to give attention to details, makes careless mistakes, and has difficulty concentrating." (T. 804). She also reported that Appellant "sometimes seems confused by her instructions and has difficulty socializing with other children." (T. 804). On the Reynolds Intelligence Screening Test ("RIST"), Appellant scored a 90, which was within the average range of ability. (T. 805). Her scores were in the "mild to moderately impaired" range on the Children's Color Trails Test ("CCCT"), which measures scanning ability, psychomotor coordination, mental flexibility, and speed of information processing. (T. 806). Appellant scored in the "below average" range on tasks of working memory and ability to sustain attention, concentrate, and exert mental control. (T. 808).

On the Test of Variables of Attention-Visual ("TOVA"), Appellant scored below a forty (40) in the area of Inattention. (T. 807). "Standard Scores below 80 are considered as clinically significant." (T. 807). Appellant's TOVA test scores indicated "considerable problems with attention, concentration, and

11

impulsivity." (T. 808).   Dr. Pedigo noted that Appellant's TOVA comparison score of -3.84 was "well beyond the ADHD reference groups' cut off score of -1.80." (T. 808).

As part of Appellant's ADHD testing, Ms. Hendrix completed a parental ADHD screener called the SNAP-IV. (T. 806). Ms. Hendrix's rating of Appellant on the SNAP-IV did not meet the criteria for ADHD. (T. 806). However, according to Dr. Pedigo, "these ratings reflect Ms. Hendrix's view of [Appellant] while on her stimulant medication, suggesting that her current regimen is effectively controlling symptoms of ADHD." (T. 806).   In total, Dr. Pedigo concluded that the test results showed the presence of an attention disorder.   He opined that Appellant would likely benefit from stimulant medication, social skills training in the form of group therapy, and tutoring in school. (T. 808).

Approximately one month later, in September 2010, Dr. Pedigo completed a "Medical Assessment for ADHD" on Appellant. (T. 977-983). Dr. Pedigo opined that Appellant had marked limitations in inattention and impulsiveness. (T. 977).   He wrote that Appellant had marked deficiencies in concentration, persistence, or pace, which resulted in a frequent failure to complete tasks in a timely manner. (T. 978). He concluded that Appellant had ADHD and that her condition persisted at the same level of severity even when Appellant was medicated.   (T. 979).   In the report attached to his

12

assessment, Dr. Pedigo opined that Appellant had marked limitations in the domain areas of "Acquiring and Using Information," and "Attending and Completing Tasks." (T. 980). In addition, Dr. Pedigo opined that Appellant had marked limitations in the area of "Interacting and Relating With Others," based on "peer socialization issues related to poor self concept and inability to inhibit impulsivity." (T. 981). Dr. Pedigo wrote that Appellant's limitations existed when she was taking medications but that the medicine "minimizes the effects of inattention and distractability to promote better academic and social success." (T. 983).

In February 2011, Dr. Pedigo completed a second "Medical Assessment for ADHD" on Appellant. (T. 1307-1313). As with the first assessment, Dr. Pedigo opined that Appellant had marked limitations in inattention and impulsiveness, and in concentration, persistence, or pace. (T. 1308). He also concluded that Appellant had marked limitations in "Acquiring and Using Information" and "Attending and Completing Tasks." (T. 1310). With regard to attending and completing tasks, Dr. Pedigo wrote that Appellant "requires frequent redirection to sustain mental effort and complete tasks - Meets criteria for ADHD based on PADDS cutoff (see report scores)." (T. 1310). Unlike his first ADHD assessment, however, Dr. Pedigo found no evidence of a limitation in the area of "Interacting and Relating With Others." (T. 1311).

**B.   School Records**

   **1.   Teacher Questionaire - Matthew Range**

On May 8, 2008, Matthew Range, Appellant's third grade teacher, completed a Teacher Questionaire evaluating Appellant. (T. 248-255). Mr. Range noted that Appellant's reading and writing abilities were at a second grade level and that her math skills were in the low third grade level. (T. 248).  In the area of "Acquiring and Using Information," Mr. Range opined that Appellant had "slight problems" comprehending oral instructions and math problems.  (T. 249). However, Mr. Range found that Appellant had "obvious problems" in (1) understanding school and content vocabulary, (2) reading and comprehending written material, (3) providing organized oral explanations and adequate descriptions, (4) expressing ideas in written form, (5) learning new material, and (6) applying problem-solving skills in class discussions. (T. 249). In addition, Mr. Range opined that Appellant had a "serious problem" recalling and applying previously learned material. (T. 249). He further stated that Appellant "has a huge problem putting her ideas down on paper." (T. 249).

In the area of "Attending and Completing Tasks," Mr. Range wrote that Appellant had an "obvious problem" with completing work accurately without careless mistakes. (T. 250).  He stated that Appellant becomes unfocused easily and "has no idea what we're

14

talking about when asked a question." (T. 250).  In the area of "Interacting and Relating with Others," Mr. Range found that Appellant had an "obvious problem" using adequate vocabulary and grammar to express thoughts/ideas in general and in everyday conversation.  (T. 251).

As for Appellant's abilities in the area of "Moving About and Manipulating Objects," Mr. Range opined that she had an "obvious problem" moving her body from one place to another.  (T. 252).  Mr. Range stated that Appellant's arthritis "makes her movements slow and awkward until she warms up and loosens up." (T. 252).  He further stated that "often in class, [Appellant] will stand to do her work because her knees and ankles get real stiff and painful." (T. 254). Mr. Range supplemented his answers to the questionaire on June 16, 2008, (T. 260-267), and stated that Appellant was in "obvious pain" at times.  "Sitting on the carpet is uncomfortable for her. She is definitely slowed down when she runs."  (T. 264).

### 2.  Teacher Questionaire - J. Junco / T. Mikell

On February 5, 2010, Appellant's teachers, Ms. Junco and Ms. Mikell, completed a Teacher Questionaire.  (T. 354-357).  Ms. Junco and Ms. Mikell noted in the questionaire that Appellant attended regular classes but "with a teacher with her." (T. 354).  In terms of academic performance, the teachers stated that Appellant's written expression and reading abilities were "slightly below" her

15

peers. (T. 355).  Ms. Junco and Ms. Mikell wrote that Appellant was often late to class because of "illness," but they did not specify the condition to which they referred.  (T. 355).  The teachers further stated that, although Appellant speaks quietly, she had no major problems with communication.  (T. 355).

In terms of Appellant's ability to understand and follow instructions, Ms. Junco and Ms. Mikell wrote that Appellant "needs to hear directions several times and to be given cues. She benefits from having tasks broken into smaller segments. She needs to be directed to read instructions carefully and follow step by step." (T. 356).  They also wrote that Appellant "frequently needs a 'push' to get started.  Before beginning a task she can seem distracted or disoriented – like she cannot figure out where to begin." (T. 356). They stated that Appellant hesitated to ask for assistance and was "not thorough in clarifying her side of the conversation." (T. 356). In terms of social abilities, Ms. Junco and Ms. Mikell opined that Appellant gets along well with others but that she tended "to have a core group of friends that she rarely ventures outside of." (T. 356).

### 3.  Test Results

On the Spring 2006 Criterion-Referenced Competency Test ("CRCT"), Appellant met the standards for Reading and Mathematics but not for English/Language Arts. (T. 328-329).  She also met the

16

standards for Reading on the Spring 2007 CRCT. (T. 330). After completing the third grade, Appellant's STAR reading level was Grade Equivalent 2.5.  (T. 268). On the Spring 2008 CRCT, Appellant met the standards for Reading and Social Studies but did not meet the standards for Science.  (T. 331-332).  A year later, on the Spring 2009 CRCT, Appellant failed to meet the standards in both Science and Social Studies, but she passed the Reading portion of the test. (T. 334-335). Likewise, Appellant did not meet the standards in two of three subjects on the Spring 2010 CRCT. (T. 336-337).

## C.  Relevant Hearing Testimony

### 1.  Ms. Shalonka Hendix's Testimony

At the hearing before the ALJ on February 25, 2011, Ms. Hendrix testified that Appellant was in the sixth grade and attended regular classes "with a teacher that follows her." (T. 43).  Ms. Hendrix stated that the extra teacher sits with Appellant in class "off to the side, where her and the teacher could be together instead of sitting in the mist [sic] of class." (T. 44).  Ms. Hendrix stated that the extra teacher helps Appellant read, writes for Appellant when her fingers stiffen, and explains the work at a slower pace. (T. 44).  Ms. Hendrix stated that during testing Appellant receives extra time and has her teachers nearby "to read it to her where she can understand it, break it down to her more." (T. 44).  Ms. Hendrix also stated that on other assignments the teachers took time into

17

account and that Appellant was graded differently than the other children. (T. 55).

Regarding Appellant's arthritis, Ms. Hendrix testified that Appellant has pain in her feet, ankles, knees, right hip, wrist and fingers. (T. 45). She stated that medicines do not help the pain and that Appellant "still swells on the medicine ...." (T. 45). She stated that the swelling occurs two to three times per week. (T. 45). Ms. Hendrix testified that Appellant had minimal hand strength and difficulty bathing when her hands swelled. (T. 47). "[A]t least twice a week" Ms. Hendrix helps Appellant write her homework. (T. 47). Ms. Hendrix stated that at other times Appellant has trouble holding things, like dishes. (T. 56).

Ms. Hendrix also testified that Appellant "can't do long standing or walking, she cannot run, ... jump rope, ... ride a bicycle ...." (T. 46). When the ALJ asked whether Appellant played soccer, Ms. Hendrix stated that Appellant tried soccer at her doctor's recommendation but that playing made it worse. (T. 46). She testified that Appellant was not currently play soccer. (T. 46). When asked about Appellant's performance at soccer, Ms. Hendrix stated that "they put her from mid-field back to defense where she was more standing around the goalie ...." (T. 47). Ms. Hendrix also explained that Appellant's tardiness and absences at school were related to Appellant's arthritis. (T. 58).

As for Appellant's learning problems, Ms. Hendrix stated that Appellant has short-term memory lapses and forgets words she just learned. (T. 47-48). She stated that Appellant gets confused with two or more directions, "[a]nd you got to keep telling her like three to four times." (T. 48). Ms. Hendrix also stated that she has to re-read words and directions to Appellant. "She gets to a point where she want to give up and I tell her she can't, she's got to keep trying." (T. 48). "She start crying, say she can't do it, she's dumb, the kids is right, she's not smart." (T. 49). Ms. Hendrix stated that Appellant is easily distracted, her speech is off, and she leaves out words when speaking. (T. 49). She testified that Appellant was currently taking medicine for ADHD. "It helps but she still get distracted but not as easily it was before." (T. 50). She also stated that Appellant's speech therapy was suspended until the summertime because her teachers complained that it was interfering with school. (T. 57).

As for Appellant's interactions with others, Ms. Hendrix testified that Appellant is not very social. She has three friends that she has known since pre-school. Ms. Hendrix stated that the other children tease Appellant, make fun of her speech, and tell her that she should be in special education. (T. 51). She further stated that two of Appellant's three friends come over on weekends and they

19

sometimes go to see movies. Other times Appellant stays in the home or will go out and eat with her father. (T. 52).

As for side effects related to medication, Ms. Hendrix testified that Appellant's weight fluctuated and that she complains of pain more when her weight increases. (T. 53). In addition, she stated that the Naproxyn hurt Appellant's stomach but that "Dr. Jarrett [sic] said that's the lowest medicine that she can giver her." (T. 54). Ms. Hendrix stated that Appellant complained "every day" about her stomach hurting. (T. 54). When the ALJ asked about Dr. Jerath's report that Appellant was not regularly taking her medicine, Ms. Hendrix stated that Appellant did not take the medicine for "almost a month" because of the difficulties scheduling an appointment with Dr. Jerath after Dr. Gibbis retired. (T. 55).

**2.  Appellant's Testimony**

Appellant also testified at the hearing before the ALJ. She stated that her arthritis gave her problems with her hands, knee, and ankle.  (T. 61, 62). "When I write is like it hurts then I can't write no more." (T. 61). "[I]f my hand hurts then she [Ms. Hendrix] do it for me." (T. 63).  Appellant also stated that the medicine she takes for her attention problems hurts her stomach.  (T. 61). Appellant confirmed that she had a "special teacher" at school that helped her.  (T. 62).  When asked by the ALJ if "they do anything special with regard to giving you tests," Appellant replied, "Not

20

really." (T. 62). She further stated that she took tests with the other children and did not receive extra time to complete her work. (T. 62). Appellant testified that she did not like reading class because she did not understand the material. (T. 63).

When asked about soccer, Appellant stated that it went "good" but that "I need like a little rest so I asked the coach." (T. 63-64). She stated that playing soccer hurt "a little bit" and that she was not playing anymore. (T. 64). The ALJ then asked Appellant how long she played soccer, to which she replied: "Four years, right?" (T. 64). The ALJ told Appellant that she could not ask her mother for help with answers, stating "If you don't remember just say you don't remember." (T. 64). Appellant then stated that she could not remember how long she had played soccer. (T. 64).

In a signed letter dated May 12, 2011, Appellant's speech pathologist, Ms. Julie Hunt, explained that Appellant played soccer in a program in the fall of 2007 and 2008:

> This program was called Backus Bears which was co-sponsored by Backus Children's Hospital and Coastal Georgia Soccer Association. This program consisted of approximately 15 children all with some type of disability. There were children with autism, Cerebral Palsy, hearing impaired and JRA. In order to participate on this team, you had to be a patient of Pediatric Rehab at Backus Children's Hospital.

(T. 1321).

21

**III.**
**Standard for Determining Disability**

A child under the age of eighteen (18) is considered to be disabled and eligible for disability benefits if she has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i); accord 20 C.F.R. § 416.906. As in all Social Security disability cases, the claimant bears the ultimate burden of proving disability by providing medical and other evidence of the claimed impairments. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 416.912(a); see also Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S. Ct. 2287, 2294 n.5 (1987).

In evaluating a claim, the ALJ must follow a three-step procedure of evaluating whether: (1) the child is engaged in substantial gainful activity; (2) the child has an impairment or combination of impairments that is severe; and (3) the child's impairment or combination of impairments causes functional limitations that meet, medically equal, or functionally equal the listing of impairments.[3] 20 C.F.R. § 416.924(a); see also §§ 416.902,

---

[3]   The listing of impairments is found at 20 C.F.R. pt. 404, subpt. P, app. 1.

22

416.911(b)(1). A child's limitations meet the listings "if the child actually suffers from the limitations specified in the [l]istings for that child's severe impairment." Shinn v. Comm'r of Soc. Sec., 391 F.3d 1276, 1279 (11th. Cir. 2004). A child's limitations medically equal the listings if, in comparison with "closely analogous listed impairments," they are "at least of equal medical significance to those of a listed impairment." 20 C.F.R. § 416.926(b)(2).

If the child's limitations do not meet or medically equal a listed impairment, the ALJ may still find those limitations to functionally equal those in the listings. § 416.926a(a). "In making this determination, the ALJ assesses the degree to which the child's limitations interfere with the child's normal life activities." Shinn, 391 F.3d at 1279. The ALJ must consider the extent to which the child's impairment(s) limits functioning in the following six "domains": (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. § 416.926a(b)(1). A child's impairment(s) is of listing-level severity if the child has "marked" limitations in two of the six domains or an "extreme" limitation in one. § 416.926a(d).

**IV.**
**The ALJ's Decision**

In his March 18, 2011, decision, the ALJ found Appellant not to be disabled at any time from April 2, 2008, the application date, through the date of his decision. (T. 28). In arriving at this conclusion, the ALJ first found that Appellant was a school-age child on the date of filing, and that she had not been engaged in substantial gainful activity since the protective filing date. (T. 19). Next, the ALJ found that Appellant had severe impairments of juvenile idiopathic arthritis, ADHD, and auditory processing disorder. (T. 19). The ALJ further found, however, that none of Appellant's impairments or combinations thereof met, medically equaled, or functionally equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (T. 19-22).

As for the opinion evidence, the ALJ gave "great weight" to Dr. Jerath, because "she is the claimant's treating rheumatologist" and had the "benefit of ... treating [Appellant] over a longitudinal period of time." (T. 23). The ALJ stated that Dr. Jerath's records are "consistent with the objective medical evidence and the medical record when viewed as a whole." (T. 23). In addition, the ALJ gave "great weight" to the opinions expressed in the "Speech/Language Questionaires," citing Ms. Hunt and Ms. Schiesser's area of expertise and the specific facts upon which their conclusions are

24

based. (T. 23). Similarly, the ALJ gave "significant weight" to the opinions and findings in Appellant's school records, because "they document [Appellant's] progress over a longitudinal period of time" and are "consistent with the record when viewed as a whole." (T. 24).

"Relatively little weight" was given to Dr. Pedigo's conclusions that Appellant had "marked" limitations, however. (T. 24). The ALJ stated that "it appears [Dr. Pedigo] relied quite heavily on the subjective report of symptoms and limitations provided by the claimant's mother, and [he] seemed to uncritically accept as true most, if not all, of what the claimant's mother reported, despite the fact that his opinion is not even supported by his own reports, or the opinions of claimant's teachers." (T. 24).

In conducting the functional equivalence inquiry, the ALJ found that Appellant had less than marked limitations in the domains of acquiring and using information (T. 24-25), attending and completing tasks (T. 26-28), interacting and relating with others (T. 28-30), moving about and manipulating objects (T. 30-31), and health and well-being, (T. 32). In addition, the ALJ found that Appellant had no limitation in her ability to care for herself. (T. 31-32). Accordingly, the ALJ found Appellant not to be disabled. (T. 32-33).

AO 72A
(Rev.8/82)

**V.**
**Standard of Review**

The scope of judicial review of the Commissioner's decision is limited. The Court's function is to determine if the decision is supported by substantial evidence and based upon proper legal standards. <u>See</u> <u>Walker v. Bowen</u>, 826 F.2d 996, 999 (11th Cir. 1987). The ALJ's decision will not be disturbed by the Court if, in light of the record as a whole, it appears to be supported by substantial evidence. <u>See</u> 42 U.S.C. § 405(g); <u>MacGregor v. Bowen</u>, 786 F.2d 1050, 1053 (11th Cir. 1986). Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. <u>MacGregor</u>, 786 F.2d at 1053. In contrast, review of the ALJ's application of legal principles is plenary. <u>Foote v. Chater</u>, 67 F.3d 1553, 1558 (11th Cir. 1995).

**VI.**
**Discussion**

Appellant argues that the ALJ erred in two ways. First, she contends that substantial evidence does not support the ALJ's finding that her impairments do not functionally equal the listings. [Doc. 11 at 14-23]. Second, Appellant argues that the ALJ failed to apply the appropriate legal standards when evaluating Ms. Hendrix's credibility. [Doc. 11 at 23-25].

26

A.  **Functionally Equal to the Listings**

Appellant contends that marked limitations should have been found in the domains of Acquiring and Using Information, Attending and Completing Tasks, and Moving About and Manipulating Objects. [Doc. 11 at 14-23]; [Doc. 13 at 1-4]. In this regard, Appellant also contends that the reasons given for discrediting Dr. Pedigo's opinions of marked limitations are "based upon an inaccurate assessment of the facts of record." [Doc. 11 at 16-23].

The Commissioner responds that the ALJ's evaluation of Appellant's ability to function in all six domains is supported by substantial evidence. [Doc. 12 at 4-15]. The Commissioner also states that the ALJ "complied with the regulations and articulated reasons for the weight he gave to Dr. Pedigo's opinions, and those reasons are supported by substantial evidence." [Doc. 12 at 7].

1.  **Dr. Pedago's Opinions**

In determining the weight to give to each medical opinion, the ALJ is to consider a number of factors: (1) whether the doctor has examined the claimant; (2) the length, nature, and extent of a treating doctor's relationship with the claimant; (3) the medical evidence and explanation supporting the doctor's opinion; (4) how consistent the doctor's "opinion is with the record as a whole"; and (5) the doctor's specialization. 20 C.F.R. §§ 404.1527(d),

416.927(d); <u>see also Davis v. Comm'r of Soc. Sec.</u>, 449 Fed. App'x 828, 832-33 (11th Cir. 2011). These factors apply to both examining and nonexamining physicians. <u>Id.</u> §§ 404.1527(f), 416.927(f).

A claimant's treating physician's opinions "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (quoting <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997)). "Good cause" exists when (1) the opinion is not bolstered by the evidence; (2) the evidence supports a contrary finding; or (3) the treating physician's opinion is conclusory or inconsistent with the doctor's own medical records. <u>Id.</u>; <u>see also Crawford v. Comm'r of Soc. Sec.</u>, 363 F.3d 1155, 1159 (11th Cir. 2004). The ALJ must "clearly articulate" his reasons for disregarding the opinions of a treating physician, and the explanation provided must include "good reasons." <u>See Winschel v. Comm'r of Soc. Sec.</u>, 631 F.3d 1176, 1179 (11th Cir. 2011); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Otherwise, "it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." <u>Winschel</u>, 631 F.3d at 1179 (quotation omitted).

Here, the ALJ gave three reasons for according "relatively little weight" to Dr. Pedigo's opinions of marked limitations. The first reason was that Dr. Pedigo relied "quite heavily" on the

subjective reports of Ms. Hendrix and "uncritically" accepted "most, if not all" of her statements as true. (T. 24).   The record shows that Dr. Pedigo administered three comprehensive evaluations on Appellant over a period of six years. See (T. 933-937, 311-321, 804-808).   According to Dr. Pedigo, the portions of the 2008 evaluation requiring input from Ms. Hendrix - the CAB and BRIEF tests - reflected Ms. Hendrix's view that Appellant was "experiencing *minimal* behavioral, educational, or adaptive difficulties within the home environment" and "*minimal* executive functioning difficulties." (T. 318-319) (emphasis added).   Similarly, Dr. Pedigo stated that Ms. Hendrix's responses to the SNAP-IV test in 2010, which did not indicate symptoms of ADHD, reflected Ms. Hendrix's view of Appellant "while on her stimulant medication, suggesting that her current regimen is effectively controlling symptoms of ADHD." (T. 806). Thus, *despite* Ms. Hendrix's responses to the evaluation questions, not *because* of them, Dr. Pedigo offered his diagnosis and opinions about Appellant's limitations.   Accordingly, the ALJ's assertion that Dr. Pedigo "heavily" and "uncritically" relied on Ms. Hendrix's subjective reports when formulating his opinions is not supported by substantial evidence.

The ALJ's second reason for giving little weight to Dr. Pedigo's opinions was that the opinions were not supported by the doctor's own examination reports. (T. 24).   As an initial matter,

29

the ALJ did not provide any explanation for this assertion. See Morrison v. Barnhart, 278 F. Supp.2d 1331, 1336 (M.D. Fla. 2003) ("[T]he ALJ's explanation that [the treating physician's] opinion 'is not consistent with the evidence of record as a whole, including the doctor's own examination findings' is too general to permit meaningful judicial review in this case."). Notwithstanding this error, there is evidence suggesting that the doctor's opinions are supported by his examination reports. First, Appellant scored a 67 in the area of "Attention and Concentration" on her WRAML-2 test in 2008, which was "significantly below average" and in the 1% of her peer group. (T. 316). Dr. Pedigo wrote in the 2008 examination report that Appellant's scores indicated "significant difficulty with sustained and divided attention as well as inhibition-disinhibition." (T. 320). Second, during the 2010 examination, Appellant scored below 40 in the area of "Inattention" on her TOVA test: "Scores below 80 are considered clinically significant." (T. 974). Dr. Pedigo wrote that Appellant's overall -3.84 TOVA score was "well beyond the ADHD reference groups cut off score of -1.80" and indicative of "considerable problems with attention, concentration, and impulsivity." (T. 975). Given that these test results contain evidence of marked limitations,[4] the undersigned

---

[4] The regulations define a "marked limitation" as "a limitation that is 'more than moderate' but 'less than extreme,' ...

declines to furnish a rationale for discrediting the doctor's opinions on the grounds that they were "not even supported by his own reports." See <u>Dixon v. Astrue</u>, 312 Fed. App'x 226, 229 (11th Cir. 2009) (noting that a court "may not supply a reasoned basis for [an] agency's action that the agency itself has not given," but that the court will "uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned.").

The ALJ's third reason for giving "relatively little weight" to Dr. Pedigo's opinions was that the opinions were not supported by those of Appellant's teachers. (T. 24). As with the second reason cited above, the ALJ did not explain how the doctor's opinions were not supportive of, or inconsistent with, the opinions of Appellant's teachers. Furthermore, the "teacher's opinions" referenced in the decision were not those of Mr. Range, who found, among other things, that Appellant had a "serious problem" recalling and applying previously learned material. See (T. 249). Nor were they those of Ms. Hunt, who opined that Appellant's processing disorder makes it difficult for her to follow verbal instructions and understand conversations. See (T. 1316). Rather, the ALJ cited "Exhibit 18E," the partially completed questionaire from Ms. Junco and Ms. Mikell,

_____

[and i]t is the equivalent of functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." 20 C.F.R. § 416.026a(e)(2)(i).

AO 72A
(Rev.8/82)

who wrote that Appellant has an additional teacher assigned to her at school and "needs to hear directions several times and to be given cues." See (T. 354-357). In addition, Junco and Mikell observed that Appellant "can seem distracted or disoriented - like she cannot figure out where to begin." Id. Considering all of the evidence, it would appear that the ALJ's unexplained assertion that Dr. Pedigo's opinions were not supported by Appellant's teachers' opinions is inadequate. See Jackson ex rel. K.J. v. Astrue, 734 F. Supp.2d 1343, 1374 (N.D. Ga. 2010) (remand required where the ALJ failed to resolve inconsistencies in the evidence).

Although Ms. Junco and Ms. Mikell also opined that Appellant was only "slightly below her fellow students in written expression and reading," the ALJ's reliance on a single teacher questionaire to the exclusion of other, conflicting evidence was error. "An ALJ may not arbitrarily pick and choose facts from the evidence to support his conclusions without articulating specific, well supported reasons for crediting some evidence while discrediting other evidence." Ellington v. Astrue, No. 2:07-cv-789-CSC, 2008 WL 1805435, at *9 (M.D. Ala. Apr. 18, 2008) (citing Marbury v. Sullivan, 957 F.2d 837, 839-41 (11th Cir. 1992)). The failure on the ALJ's part to resolve conflicts in the evidence requires that the case be vacated and remanded for the proper consideration. Hudson v. Heckler, 755 F.2d 781, 785 (11th Cir. 1985). This is so

because the Court cannot determine whether the ALJ would have given Dr. Pedago's opinions less than considerable weight had he had not made the errors described above. See Shuren v. Comm'r of Soc. Sec., 6:11-CV-1191-ORL-GJK, 2012 WL 4194665 (M.D. Fla. Sept. 19, 2012).

## 2. Acquiring and Using Information

In the domain of acquiring and using information, the Commissioner "consider[s] how well [claimants] acquire or learn information, and how well [they] use the information [they] have learned." 20 C.F.R. § 416.926a(g). "[T]his domain considers more than just assessments of cognitive ability as measured by intelligence tests, academic achievement instruments, or grades in school." SSR 09-3p. In this regard, the regulations state the following:

> When you are old enough to go to elementary and middle school, you should be able to learn to read, write, and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others.

20 C.F.R. § 416.926a(g)(2)(iv).

33

Limitations in this domain include having difficulty recalling things learned at school and talking only in short, simple sentences with difficulty explaining what is meant. Id. § 416.926a(g)(3)(iii), (v). School records are a significant source of information about limitations in this domain. SSR 09-3p. Besides test scores, the Commissioner considers "all the relevant information in [the] case record that helps [him] determine [the claimant's] functioning, including [ ] signs, symptoms, and laboratory findings, the descriptions ... about [the claimant's] functioning" and other relevant information. 20 C.F.R. § 416.926a(e)(1)(i).

A marked limitation will be found in this domain and others when "(1) the claimant has 'a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain'; and (2) the claimant's 'day-to-day functioning in domain-related activities is consistent with that score.'" Jackson ex rel. K.J. v. Astrue, 734 F. Supp. 2d 1343, 1371 (N.D. Ga. 2010) (citing 20 C.F.R. § 416.926a(e)(1)(iii)). In other words, a marked limitation exists when the impairment "interferes seriously with the ability to independently initiate, sustain, or complete activities." Id. § 416.926a(e)(2).

Here, the ALJ did not adequately explain his finding that Appellant had less than marked limitations in the domain of

34

acquiring and using information. Furthermore, he mischaracterized the evidence cited in support of his finding, and he overlooked evidence that would have supported a conclusion inconsistent with the one reached. See Jackson, 734 F. Supp. 2d at 1371-72 (remanding where ALJ "inadequately address[ed] the issue of acquiring and using information, especially given the conflicting evidence on this issue"). In particular, the ALJ commented that Appellant "met the standards in all subjects except science on the Spring 2008 Georgia CRCT," (T. 25, 480-82), but he failed to acknowledge that Appellant failed two (2) out of three (3) subjects on both the 2009 and 2010 Georgia CRCT. See (T. 334-337). Similarly, the ALJ cited that Appellant "earned passing grades on her 2007-2008 report card," see (T. 25), yet he overlooked all of Mr. Range's concerns about Appellant from that year, including Range's opinion that Appellant had "a serious problem" in "expressing ideas in written form" and "recalling and applying previously learned material." (T. 260-261). Given the errors made in evaluating Dr. Pedigo's opinions, as well as the undiscussed evidence of Appellant's persistent "difficulty with retaining knowledge and skills," see, e.g.,(T. 1314), the Court must conclude that the ALJ failed to consider Appellant's condition as a whole in arriving at his finding. See Thomas v. Comm'r of Soc. Sec., 497 Fed. App'x 916, 918-19 (11th Cir. 2012) (citing Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005)).

35

Accordingly, the undersigned **RECOMMENDS** that the ALJ's decision be **REVERSED and REMANDED**. On remand, the ALJ should re-assess his findings regarding Appellant's limitations in acquiring and using information in accordance with the applicable statutory regulations. <u>See</u> 20 C.F.R. § 416.926a(f)-(g).

### 3. Attending and Completing Tasks

In the domain of attending and completing tasks, the Commissioner considers "how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them." 20 C.F.R. § 416.926a(h). Attention involves regulating levels of alertness, maintaining concentration, filtering out distractions, remaining focused long enough to complete tasks, returning to a task to finish it, and changing focus once a task is completed. 20 C.F.R. § 416.926a(h)(1)(i). The regulations state the following:

> When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to

36

> complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv).

Examples of limited functioning in the domain of attending and completing tasks include: (1) slow to focus on or unable to complete activities;(2) easily frustrated and prone to give up on tasks; and (3) in need of extra supervision to remain engaged in an activity. Id. § 416.926a(h)(3)(ii), (iv), (v).

Here, the ALJ cited to Dr. Pedigo's examination records, as well as Appellant's 2007-08 report card and performance on the 2008 CRCT, to find that she had less than marked limitations in the area of attending and completing tasks. For the above stated reasons, see supra Part VI.A.1 and 2, the ALJ's consideration of the evidence was inadequate. Accordingly, the Court **RECOMMENDS** that the ALJ's decision be **REVERSED and REMANDED**. On remand, the ALJ should re-assess his findings regarding Appellant's limitations in attending and completing tasks in accordance with the applicable statutory regulations. See 20 C.F.R. § 416.926a(h).

### 4. Moving and Manipulating Objects

In the domain of moving and manipulating objects, the Commissioner considers how "you move your body from one place to another and how you move and manipulate things." 20 C.F.R. §

416.926a(j).  The regulations state that school-age children should
be able to do the following:

> As a school-age child, your developing gross motor skills
> should let you move at an efficient pace about your
> school, home, and neighborhood. Your increasing strength
> and coordination should expand your ability to enjoy a
> variety of physical activities, such as running and
> jumping, and throwing, kicking, catching and hitting balls
> in informal play or organized sports. Your developing fine
> motor skills should enable you to do things like use many
> kitchen and household tools independently, use scissors,
> and write.

20 C.F.R. § 416.926a(j)(2)(iv).  Examples of limitations in the
domain of moving and manipulating objects include muscle weakness
and joint stiffness; difficulty bending, kneeling, crawling,
running, and jumping rope; and difficulty gripping and grasping
objects. Id. § 416.926a(j)(3)(i)-(v).

　　In this case, the ALJ gave two reasons for finding that
Appellant had less than marked limitation in moving about and
manipulating objects. (T. 31).  First, the ALJ stated that "a review
of the evidence reveals the treating physicians consistently had
trouble finding any joint swelling."  Second, the ALJ cited that
"Dr. Jerath indicated that it was the claimant's 6th year for
playing soccer." (T. 31).  Setting aside the conflicting evidence
of how long Appellant played soccer, there is evidence that the
program Appellant played in was modified for children with autism,
Cerebral Palsy, and arthritis. (T. 1321).   This evidence, if

38

credited, would account for limitations in this domain, rather than show that Appellant could actually meet the normal physical demands of the sport.

Furthermore, no mention was made of Mr. Range's observations that Appellant was "obviously" in pain at times; that she had to stand to keep from getting stiff; that sitting on the carpet was uncomfortable for her; or that walking hurt her ankles. (T. 264, 266). Although the ALJ did cite to Dr. Jerath's records from 2010, Dr. Jerath indicated both that there was no joint swelling and that Appellant was tender to palpation. (T. 949, 984). Overall, Dr. Jerath's records tend to support the ALJ's findings, but "the failure to mention or consider contrary medical records, let alone articulate reasons for disregarding them, is reversible error." Smith v. Astrue, No. 3:08-cv-406, 2009 WL 3157639, at *8 (M.D. Fla. Sept. 25, 2009) (citing McCruter v. Bowen, 791 F.2d 15444, 1548 (11th Cir. 1986)).

For these reasons, the Court **RECOMMENDS** that the ALJ's decision be **REVERSED and REMANDED**. On remand, the ALJ should re-assess his findings regarding Appellant's limitations in moving and manipulating objects in accordance with the applicable statutory regulations. See 20 C.F.R. § 416.926a(j).

39

**B.  Credibility Determination**

Appellant next argues that the ALJ failed to apply the appropriate legal standards when evaluating Ms. Hendrix's testimony. [Doc. 11 at 24-25]. Specifically, Appellant contends that the ALJ's statement that Appellant's ADHD is controlled on medication, which was contrary to Ms. Hendrix's testimony, was based on a misunderstanding of the evidence. Likewise, Appellant contends that the ALJ overly relied on a misunderstanding of the extent to which Appellant played soccer. [Id.].

The Commissioner responds that the ALJ did not err in evaluating Ms. Hendrix's credibility because her responses on the tests administered by Dr. Pedigo show that Appellant's "condition was effectively controlled by medication." [Doc. 12 at 17]. Further, the Commissioner argues that "there is no question that Appellant played soccer for more than a year after the alleged onset date," thus the ALJ did not err by relying on that evidence to discredit Ms. Hendrix. [Doc. 12 at 17].

Although "credibility determinations are the province of the ALJ," see Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir 2005), a challenged credibility determination is "review[ed] to determine if it is supported by substantial evidence." See Preston v. Barnhart, 187 Fed. App'x 940, 941 (11th Cir. 2006). The ALJ must "clearly 'articulate explicit and adequate reasons' for discrediting

40

the claimant's allegations of completely disabling symptoms." <u>Dyer</u> <u>v. Barnhart</u>, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting <u>Foote</u>, 67 F.3d at 1561-62).   The Commissioner considers the objective medical evidence and the following factors in evaluating credibility: daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medications; treatments other than medication; and any other factors or additional measures taken to relieve symptoms.   20 C.F.R. § 416.927; SSR 96-7p.

In this case, the ALJ's credibility determination must be reevaluated in light of the errors made in evaluating the domains of acquiring and using information, attending and completing tasks, and manipulating and moving objects.   See <u>Foote</u>, 67 F.3d at 1561 (ALJ required to consider the entire record when considering whether evidence of daily activities is substantial evidence); <u>Jackson</u>, 734 F. Supp. 2d at 1375-76 (errors in evaluating functional equivalence required reconsideration of the credibility determination).

Accordingly, the undersigned **RECOMMENDS** that this case be **REVERSED and REMANDED** for further proceedings consistent with this Final Report and Recommendation. On remand, the ALJ should re-assess his findings regarding the credibility of Appellant's mother's testimony in light of the applicable statutory regulations and

41

this Circuit's case law. See 20 C.F.R. § 416.929; <u>Foote</u>, 67 F.3d at 1562.

## VII.
### Conclusion

For the foregoing reasons, **IT IS RECOMMENDED** that the decision of the Commissioner finding Appellant not to be disabled be **REVERSED and REMANDED** for further proceedings consistent with this Final Report and Recommendation.

The Clerk is **DIRECTED** to terminate the reference of this case to the undersigned magistrate judge.

**SO REPORTED AND RECOMMENDED**, this 12th day of August, 2013.


_s/ E. Clayton Scofield_
E. CLAYTON SCOFIELD III
UNITED STATES MAGISTRATE JUDGE

42